THOS. H. BUTLER v. GEO. W. McMILLEN, *Co. Clerk, &c.*

1. TRIAL — *When to be Concluded.* A trial should be completed, so far at least as the introduction of testimony is concerned, at the term at which it is commenced.

2. ————— *Effect of Continuance before Trial Completed.* Where a trial has been commenced at one term, the testimony of the plaintiff and part of that of the defendant introduced, and then the trial stopped by reason of the close of the term, and the case continued from term to term till the third ensuing term, and at such third term the trial is resumed, over the objection of the defendant, and the defendant concludes his testimony, and there is nothing further offered except evidence in rebuttal, *held,* that a finding supported by the testimony offered at the last term would not be disturbed, nor could any inquiry be made at the instance of the plaintiff into errors alleged to have taken place in the rulings of the court on the trial at the first term.

25—13 KAS.

*Error from Neosho District Court.*

INJUNCTION, brought by *Butler* (under authority of § 5, ch. 79, laws of 1871,) to enjoin *McMillen* from removing his office of county clerk, and the records thereof, from Osage Mission to Erie. The county-seat had been duly located at Osage Mission, and the county offices were there kept and held. An election was held March 26th 1872 for the purpose of relocating the county-seat. The board of· county commissioners canvassed the vote, and caused proclamation thereof, showing that 3391 votes had been cast, of which 1712 were in favor of Erie, and 1679 were in favor of Osage Mission, and determined that the county-seat by a majority of 33 votes was located at Erie. *Butler* in his petition for an injunction alleged that said election was void, claiming, first, that the petition for the election was fraudulent, and did not contain names of electors equal to three-fifths the whole number of electors in said county as shown by the last registration made by the assessors and on file in the county clerk's office, as provided by the act "for the registration of all adult persons in each county," (ch. 86, Gen. Stat., 894; § 4 of ch. 26, Gen. Stat., 297;) second, that no valid election was held in Erie precinct. Regarding the first objection, *Butler* alleged that of the pretended signatures to the election-petition more than six hundred in the aggregate were names of fictitious persons, minors, and non-residents, and names of resident electors signed thereto without their knowledge or consent. Respecting the election held at Erie precinct *Butler* alleged that before the polls opened 83 fictitious names were placed on the poll-books, and a corresponding number of spurious ballots placed in the ballot-box; that 259 votes only were actually polled, (of which fifty were cast by minors and non-residents,) making the whole number at the closing of the polls (including said 83 spurious votes) 342, of which the election-board canvassed 337 as cast for Erie and 5 for Osage Mission; that afterward the poll-books and returns for said precinct were destroyed by the election-

board of Erie, and that said board manufactured new and spurious poll-books and returns showing that 595 votes were cast at Erie precinct, (of which 590 were for Erie and 5 for Osage Mission;) that these 595 votes so fraudulently returned from Erie were canvassed by the county board, and said 590 included in the number (1712) canvassed and allowed in favor of Erie for the county-seat. *McMillen* answered, denying the averments of the petition, and alleging that illegal and fraudulent votes were cast at Osage Mission, and other precincts, and canvassed for and in favor of Osage Mission for the county-seat. The trial commenced on the 23d of April 1872, (at the April Term of the district court,) and continued through eleven days, until the 4th of May, when the trial was continued until the next term. The trial was resumed at the April Term 1873, when fifteen days more were occupied in taking testimony, and then the court took the case under advisement until the next term. More than fifty witnesses were sworn and examined. No testimony was offered in regard to the petition for the election, but the evidence on both sides was mainly in regard to the alleged frauds at Erie precinct, and alleged illegal and fraudulent voting at Osage Mission and other precincts. Five witnesses (citizens of Osage Mission) testified that they were present when the polls were closed at Erie and proclamation of the result of the election there was made; that there were only 342 names on the poll-books, as numbered, and that the ballots were taken from the ballot-box and counted in their presence, and were 342 in number. One of the clerks of said election, called by defendant, testified —

"At the time the polls closed the proclamation made was, that the polls of that election was now closed. I did not hear anything said with regard to the votes cast. After the announcement that the polls were closed they commenced counting out the votes. They continued to count until they got through. Don't know how long it was. Stopped counting two or three times, a little while at a time. Think Layng, Quinlan, and other Osage Mission men left about 9 o'clock; may be not so late. It was before we had finished

counting the votes, perhaps three-quarters of an hour. Don't know why they left at that time. We had between 300 and 400 votes counted out when they left. Think there was about the same number counted out when they left that we had numbered on the poll-books. About the time the Osage Mission men left, G. F. Dutton (of the judges of election) remarked to the house that the whole number of votes cast was 342, and remarked that we would like to have the room, and they (the Osage Mission men) lit out. That (342 votes) was not the true number. I knew they were not all out. Don't know why he (Dutton) did it; 342 may have been the last number that had been set down at that time. Immediately after those men left the house we took a little rest, and then commenced counting out again. I mean we *recommenced* counting out the balance of the ballots that were in the box; commenced counting out of the same box we had been using all day. The box was open while they were taking the ballots out. Before the Mission men went away the board did not want the room cleared, or at least the board said nothing about wanting it cleared. The Mission men gave them no time to say anything about their remaining longer if they wanted to. At the time Dutton said the whole number of votes cast was 342 we had not numbered all the names that were on the poll-books. None of the poll-books was in public view. They were not in public view all the time we were numbering them. They were in separate sheets. The sheets that we were numbering could have been seen by those in the room, at least by those standing close by. We had sheets with names on them that were underneath the ones we were numbering. We kept them out of sight that way until the men from the Mission left. We did it simply because we knew that if the Mission men knew how many votes we polled they would poll four times as many in order to beat us. We had a couple of large blotting papers that we used that we placed on top of our poll-books; kept one above and one below my hand. When we filled a sheet would place it underneath the pile from which we were using. * * * I don't know what part of the page the number "342" was. The number may have been halfway down a page when the polls were closed. When the Mission men left I don't remember whether we had numbered all the names that appeared in their sight or not. We stopped counting because one of the judges said they were all counted out. I did know better than that at the time. I said some-

thing about it not being correct a little while afterward; think I asked him what he called out that number for, or something to that effect. He said it would not do to let those Mission men know how many were polled, for if we did they would go down and raise their count enough to beat us."

Considerable testimony was given by the defense for the purpose of showing that the Osage Mission party had used money improperly to influence voters in favor of Osage Mission. One witness testified that at the first election (at which there was no choice) he had voted for Erie, but afterward sold his vote to the Missionites for two-dollars-and-a-half and at the second election had voted for Osage Mission. At the July Term 1873 the court made its findings of fact and conclusions of law. Its findings were, that the election at Erie was legal, that the county commissioners rightly canvassed and counted the vote from that precinct as returned, and that Erie had received a majority of the legal votes cast;* and its conclusion was, that plaintiff *Butler* was not entitled to the relief demanded. Judgment was entered in favor of the defendant, and the plaintiff brings the case here on error.

*Carpenter & Jones,* and *John T. Voss,* for plaintiff.

*Stillwell & Baylies,* for defendant.

The opinion of the court was delivered by

BREWER, J.: This is a contest over a county-seat election in Neosho county. The contestants now, as heretofore, were Osage Mission and Erie. As the result of the canvass, the county commissioners declared that Erie had received a ma-

[* THE commissioners' canvass was, *total vote*, 3391—1712 for Erie, and 1679 for Osage Mission; majority for Erie, 33. This election was held March 26, 1872. An examination of the official canvasses (as given in the Annual Reports of the Secretary of State) shows that the *total vote* cast in Neosho county at the general election was as follows: In November 1871, for Representatives, 1949, (being 1442 *less* than at the county-seat election held March 26, 1872;) in November 1872, for Representatives, 2709, (being 682 *less* than at the county-seat election of March 26, 1872;) in November 1873, for Representatives, 2032, (being 1359 *less* than at the county-seat election held March 26, 1872.) —REPORTER.]

jority, and directed the removal of the county offices to that place. Plaintiff in error, who was plaintiff below, instituted this proceeding to contest the election, and to restrain such removal. The judgment of the district court was in favor of the defendant, and sustained the result of the canvass as declared by the commissioners. The record of the case is very voluminous, comprising 647 pages of legal cap. As errors in the proceedings of the district court, plaintiff alleges certain rulings in the introduction of testimony, permitting an amendment of the answer, and certain of the findings of fact, and conclusions of law. But preliminary to any inquiry into these matters we are met by a counter objection on the part of the defendant, which, if well taken, is conclusive of the case. The trial was commenced at the April Term 1872 of the district court of Neosho county. The plaintiff introduced his testimony, and rested. The defendant commenced his, and examined a witness or two. All this testimony was reduced to writing as it was given. Before the defendant had rested, the April Term closed, and the further hearing was postponed. The record reads as follows: "And the time fixed by law for the holding of said April Term of court having expired, this cause was continued from term to term until the April Term of said court 1873, when the same was resumed." By law two terms intervened between the commencement and close of the trial. At the April Term 1873 the defendant finished his evidence; rebutting testimony was offered, and the case submitted to the court. The trial in April 1873 was treated as a continuance that began in April 1872, and as though there had been but an adjournment from day to day during the same term. There was no formal offering of the testimony as written down; no re-examination of the witnesses. Now it is insisted by counsel for defendant in error that the trial which commenced in April 1872 was ended by the close of the term, and that that in April 1873 was a separate, independent trial, and as at that time no testimony was offered supporting the plaintiff's claim the judgment was properly entered for defendant. We think

this objection of the defendant in error well taken. We do not understand that a case can be tried piecemeal in this way. Here two terms and a year's time intervene between the term at which part of the testimony is heard, and that at which the remainder is introduced. If the case were tried before a jury, the impropriety would be more apparent, in view of the difficulty of securing the re-attendance of the same triers; but the impropriety would not be more real where a great length of time intervenes, as in this case. Undue weight will very likely be given to the testimony offered at one of the terms. The case is not presented to the consideration of the court in a symmetrical and well-proportioned manner. Impressions settle into convictions, while the manner of witnesses and much of the minutia which gave rise to those impressions are forgotten. It frequently happens that the testimony on the one side, even when not contradicted, is explained or qualified by that on the other, and when so explained or qualified carries a very different meaning from that which it conveys by itself alone. If this explanation or qualification is not heard for a year, it will often go but little ways toward changing the effect first produced on the mind. The whole force of the argument in favor of the statutory requirement that exceptions must be reduced to writing *at the term,* is against the propriety of a trial in the manner this was tried. Again, at common law, the judgment and all proceedings were entered and dated as of the first day of the term, as though it was but a single day's duration, and there were no break or interruption of any kind in the session of the court. The idea seemed to be, that a trial was a continuous proceeding from its opening to its close. The jury were under charge of an officer, and forbidden to separate through the entire trial, and not as now, only when counseling upon the verdict. A criminal trial once commenced must be carried through to its close, and a failure to finish it was equivalent to an acquittal of the defendant. Jurors were and are summoned only for the term. Process for witnesses loses its force at the end of the term.

Exceptions must be reduced to writing at the term. Questions ·even have been raised as to the power to continue a motion for a new trial to a subsequent term, though in Ohio and in this state it has been decided that such a motion could be continued. (*Coleman v. Edwards,* 5 Ohio St., 51; *Brenner v. Bigelow,* 8 Kas., 496.) In Ohio the continuance of such a motion does not carry with it the right to ·make a bill of exceptions as to rulings upon the trial. (*Kline v. Wyman,* 10 Ohio St., 223; *Morgan v. Boyd,* 13 Ohio St., 271.) "All ·indictments and information shall be tried at the *first term* at which the defendant appears, unless the same be continued for cause." (Crim. Code, § 157, Gen. Stat., p. 845.) "Actions shall be triable at the *first term* of the court after the issuse therein by the time fixed for pleading are or should have been made up." (Civil Code, § 315, Gen. Stat., p. 689.) A trial docket is to be made out twelve days before the term, and actions set for particular days, and so arranged that they may be tried as nearly as possible on the days for which they are set. (Code, § 313, Gen. Stat., 688.) We are aware that the statute empowers the court to continue "an action at any stage of the proceedings." (Code, § 316, Gen. Stat., 689.) But the question here is not as to the power to continue, but the effect of the continuance. The court may break up a trial at any time, and continue the case; but at the next term the trial must be recommenced, and cannot be taken up where it was left off. "A final adjournment of the court for the term operates as a legal discharge of a jury, and terminates their functions as such." (*Ashbaugh v. Edgecomb,* 13 Ind., 466.) In Indiana there is a special statute applicable to cases where the time fixed by law for the close of a term comes in the midst of a trial. (2 Gavin & Hord's Stat., 27, § 32; *Dorset v. Rosenthal,* 39 Ind., 209.)

Our conclusion then is, that inasmuch as the plaintiff ·at the April Term 1873 offered no testimony to support his case, the defendant was entitled to judgment, and that it is immaterial whether any errors were committed in the rulings in April 1872. At the time the trial was resumed in April

1873 the defendant objected to any consideration of the testimony offered the year previous, and moved for a dismissal of the case, so that the matter was fully called to the attention of the district court. While we have been constrained to place our decision upon this ground, we deem it due to the parties litigant, and interested, and to the importance of the case, to say, that we have examined the whole record before us, and considered all the objections made by counsel for plaintiff in error to the various rulings of the district court, and that, while upon such record there appears a great conflict of testimony, yet in accordance with well-settled rules of decision we should have been compelled to uphold the findings of the trial-court upon the disputed questions of fact.

The judgment will be affirmed.

All the Justices concurring.